I'm appointed to represent Mr. Gist-Davis, the appellant defendant in this case. I'm going to point, I'm going to address three points, perhaps three issues. Did the district court err in finding that this case presented a teary stop and that reasonable suspicion supported the stop and the frisk, the search? Secondly, and I won't spend a lot of time on this, did the facts of the case really show a seizure, not an investigative stop? But thirdly, what is the effect of the recent Fourth Circuit case of United States v. Buster on this case, which was decided long after the case was presented in the district court? First, this occurred on October 3rd, 2018. I'm guessing, because the record doesn't state exactly, that the events took place probably between 5 to 10 p.m. I'm not sure exactly. It was dark. But the location is a big, think state fair, except it's put on by the city of Winston-Salem. And done annually, then called Dixie Classics Fair, now Carolina. There's a Coliseum in it. Right across the fairway, yes, or contiguous to the Coliseum, exactly. Done every year, big, attracts families, children. This is done during the evening hours, but think more Times Square, not a dark street. Winston-Salem Police have a gang unit. And the three officers that are involved in this stop, search, are all members of the gang unit. And as the name implies, a gang unit focuses on gangs. Three officers are involved, Singletary, Montgomery, and Jamerson. Singletary, first, is in what I think is probably, looking at his computer, in the command center there at the fair. And he notices a post. The gang unit focusing on gangs monitors social media, including Facebook. This Facebook post comes up, attributed to Mr. Jus Davis. It's not disputed that he posted it in the district court. It was in Chando, was the username, but it was attributed to him. Singletary knew that Mr. Jus Davis was a felon. He was a member of a gang. And he knew some other information. It's not really significant all the things he knew about it, but he was concerned enough that he texted out to his gang unit there. And by the way, the gang unit appears from the record that that was their duty during the time of the fair, to have the gang unit there. And in the words of Officer Montgomery at the hearing, we're there at the fair for the sole purpose of preventing violence from happening in public places. That's at Joint Appendix 29. So Singletary was concerned enough that he text out the post. And I'll now move to what Officer Montgomery testified to at the hearing in the district court. He gets the text. He logs into his Facebook account on his cell phone. And he sees the text, and he interprets it the same as Singletary did. I should back up a little bit. Here's the text, and you probably have looked at that. Oops, O-O-P-S. I'll talk about more how they interpreted oops. But to me, I would say oops, like I forgot to attach something to my email. Oops, see me at the fair? Yeah, I got it on me, little boy fanny pack gang. That was the text that caused Singletary, and he testified that he interpreted that, that Mr. Jus Davis would be at the fair, and he would have a firearm or a weapon in a fanny pack. Officer Montgomery got the text and interpreted the text, the cryptic phrase, the same way as Singletary. He knew that Mr. Jus Davis was a felon. He knew he was a member of the gang. He had actually participated in a probation search of Mr. Jus Davis, I think probably a year before, accompanying the probation officers who did a warrantless search. So I guess he knew what he looked like and probably remembered him. At the fair, I should say that Montgomery noticed that the day before, since he was on the Facebook page, that Mr. Jus Davis appeared in a picture with a fanny pack. Fanny pack being something you normally think of worn on the backside that can carry small items. He also was very much on alert because they said that there was a patron struck by a bullet. They didn't say that somebody shot the patron. They certainly didn't say that Mr. Jus Davis was involved in this, but they were on higher alert because somebody had been struck by apparently a bullet. That's kind of vague. Generally speaking, though, we think if someone's struck by a bullet, that it happened because somebody shot a gun. Yes, sir. I have to agree with that. The record's kind of vague on the facts of that. The record also talks about a shooting. Mr. Montgomery, Officer Montgomery, knew about a shooting that involved Mr. Jus Davis at his house. The record is very vague on that. The implication the officers, I'm sure, were drawing from it is that as a member of the gang, he's a victim. But the record's not real clear through their testimony. Nevertheless, there was a shooting that came into their calculus. And how long before this did that shooting at his house occur? I think it was within a month, Your Honor, and there might have been more than one incident. So, obviously, they testified that that came into their calculus regarding reasonable suspicion. Now, I want to now move to the testimony of the third officer, Officer Jamerson. And at page 74 of the joint appendix, she says, she testified, specifically the gang unit is there at the fair to patrol the fairgrounds to ensure the safety of everyone, but also, more importantly, to be on the lookout for gang members and the signs of violence that often accompany gang members at the fair. I realize this cuts both ways, but my point is a gang unit is focused on gang members, and we'll talk more about that later. Well, they're focused on gang members, but it actually tells us why they're focused on gang members. That's because gang members bring violence with them. And if you're, like, at a fair, preventing violence seems like a laudable goal. I have to agree, Your Honor. They're not looking for gang members for the sake of gang members. They're looking for gang members, as she explains, because of the violence that typically comes with them. Yes, sir. I won't disagree with that. So, at some point, by the way, Officer Jamerson interprets the text. She testifies the same way. She knows the same thing. I think that the officers collectively get to say this is what we all knew as a group and that that was what they were relying on for reasonable suspicion. Jamerson joins up at some point with Officer Montgomery, and they say within 15 minutes or so they're going about the fair looking for Mr. Jus Davis. Officer Montgomery testifies. He sees him at a distance. Now, I'm not exactly sure if all... By the way, a third patrol officer has joined them at some point in this situation. Just not a gang member, but Jay Ray is his name. I'm not sure if all three officers are walking down the fairway and walk past Mr. Jus Davis, but Officer Montgomery testifies that he sees... He makes eye contact with Jus Davis, and there's a reaction. He... Just a reaction, but if it was three officers side by side or even just Officer Montgomery walking independently, he said he got a reaction from them. They said that they... I may not remember the record. I thought he said they spread out across the fair to try to find him. But, Jay, I don't think the record is clear. Just say at some point that they spread out, right? I don't disagree, Your Honor. But at the critical time, there are three police officers present. Jamerson, Montgomery are both gang members, a gang squad, and they're dressed in police uniforms, and the patrol officer, we would assume, is dressed in police uniforms. So they were known. So if Mr. Jus Davis sees one or more of these officers, clearly, maybe he reacts. Jamerson and Montgomery are together. Wait, why? You said surely he reacts. Why is it that you think he reacts? Because he's got a gun and he's a felon? Well, Your Honor, the evidence is clear that he had a gun in the fanny pack. And if that's the end of the count... And that he's a felon, too, right? Not that just he's prohibited from having a gun at the fair, right? That is a separate problem. But he's a felon, so he's totally prohibited. He is. That's correct, Your Honor, on all points. Well, tell us, Mr. Tote, what should the officers have done? I mean, they have this information. They think, according to gang speak and their experience, that this man is bringing a gun to the fair. He's a convicted felon. He has a record of armed robbery, doesn't he? Yes, sir. Yes, ma'am. Yeah. And so what are they supposed to do? You're saying they had to wait until he pulled the gun? I contend that, like, in Terry v. Ohio, they should investigate. This case was decided on a Terry stop. Why wasn't this a Terry stop? We've said in Elston and in some other cases back in the 90s that the mere fact of applying handcuffs does not, per se, convert a Terry stop to an arrest. And you had a crowded fair. At least there was some testimony that, at points, people were shoulder to shoulder. What were the police supposed to do here? That's what I'm trying to understand. What was their alternative? I'm going to argue that they should have investigated more. There's three police and one suspect. You're saying they should have gotten a warrant? No, Your Honor. No time for that. They should have gotten a warrant. They should have investigated. I'm taking the position. They should do this without a warrant. You agree to that? Yes, Your Honor. Absolutely. Why wasn't this a Terry stop? Because they were patting down the fanny pack. They were patting down his person. The fanny pack was on his person. So I guess what I'm trying to do is take your perspective to the next step, and if they had not patted the fanny pack and had restricted themselves to his body only, were they then required to let him go and take off the handcuffs and access the fanny pack when their evidence tied the gun to the fanny pack, not to his body? I understand your point, Your Honor. I'm taking the position that, as in Buster, the record's not completely clear. It's not clear at all as to when the fanny pack was removed from him. But here's the critical point. It was on him when he was patted down. I won't concede that, Your Honor. I don't think the record says it. I think that was in the video, wasn't it? Well, yes, Your Honor. The video, and obviously you've seen it. It shows the fanny pack in front, not in back. Right. But his hands are behind him. And I'll say that the critical point about Buster is that not that in Buster they removed the pack or whatever they had and put it aside, and the court held he was disabled, he was on the ground, he could not get to it. My critical point is this. If Buster is the law in this circuit, which I think it is today, just Davis was disabled. Montgomery testified he took over because Jamerson first grabbed him. Very quickly Montgomery must have grabbed him because the testimony was that Jamerson handcuffed him. At that point he's disabled. The bag is in front of him. Well, why isn't it a valid distinction, though? Because Buster, the court is talking, Judge Heitens is saying, that this was not simply a quick frisking of a suspect or a bag. It was a search of the bag. And here we didn't have a search. We had a pat-down of the bag. The officer spelt the hard object. And at that point, applying that information with their information that he was coming to the fair with a gun in his fanny pack. So it's not a Buster search where the bag had been cut off of a person and removed to another location and searched. He was simply patted down and the pat-down included the fanny pack because the factual suspicion pointed to the fanny pack. So it seems to me we've got a little bit different case than Buster and you've got to tell us why we extend Buster to this situation. And that's a fair question, Your Honor. And I say that like Terry v. Ohio. And Terry v. Ohio, this officer, McFadden, I think his name was, he approaches three people and he goes up and the court found he ultimately had reasonable suspicion and he investigated. He talked to them, spun Kerry around, frisked him, felt the gun, and took it off of him. I say that the Buster decision applies to the case where the suspect could still get to the weapon. And the critical part about Buster is that Buster was immobilized on the ground. In this case, Mr. Davis had the handcuffs on him when the frisk was done. I take the position it is not a material distinction in the facts. This court obviously makes the vote. I do not. But I'm taking that position that he was disabled. He couldn't get to the gun. And I think that's a really good point. But you still haven't explained why the fact that Buster, the holding was predicated on the fact the bag was completely searched, okay, without probable cause. Here you had the pat-down where the officer felt the gun,  that he was coming to the fair with a gun in his fanny pack. So this wasn't a complete search as in Buster that the court invalidated. It was a pat-down here of the fanny pack that was on his person as part of the Terry frisk. So if you could account for that distinction, it wasn't a full search as in Buster. Could you address that? And I have to go back to the – I see your point that the officers in Buster may not have known that there was a weapon. I don't think – I'm going to argue that that is not the critical distinction. And I go back to the fact that he was disabled. He couldn't get to it. And the court asked, was he required to get a warrant? I'm going to argue that under these facts, like in Buster, there should not have been a search, even when the officer felt it. Okay, but here in Buster, the opinion says, the government offers no explanation for how the contents of the bag presented any credible threat to the officer's safety at the time they searched it. Okay, now you're saying then that simply because he was handcuffed, there was no credible threat. Well, what happens afterward then? Let's just say the officers agreed with you and said, well, he's handcuffed. He really can't get to this fanny pack because I think the video showed it was on the front of his body. What if they agreed with you? Then they just let him go? No, Your Honor. They at that point have to get a warrant to search the fanny pack. I thought you said they didn't need a good warrant. Not in advance of the search. I apologize, Your Honor. I misunderstood the question. After, obviously, after Officer Jamerson did a frisk and felt it, because the record doesn't say the fanny pack had been removed, obviously if it had, I think the court might agree that this case was very much on point with Buster. But I do. It was a .38, wasn't it? The weapon, Your Honor? I'm not sure. I don't know. It was loaded. I think that's the record. Yes, sir. Well, I see I'm red. You've used all your time and you've saved some. Let's find out what the government has to say about this. Thank you, Your Honor. Mr. Gallion? Thank you, Your Honor. I removed my mask. Is that okay? Yes, sir. Okay. May it please the court, Mr. Trivett, Randall Gallion for the United States. I'm from the Middle District of North Carolina. Your Honor, this case, the district court correctly denied this defendant's motion to suppress the admission of that firearm because, based on the totality of the circumstances, the Winston-Salem Police Department's gang unit had reasonable suspicion necessary to stop the defendant in this case. In reviewing the evidence in the light most favorable to the government as the prevailing party in this case, this court should affirm. And considering the evidence adduced by the three gang unit officers during the course of the suppression hearing, the evidence was that Mr. Gibbs Davis was, they knew he was a felon. They knew he had been convicted of robbery. They knew that he was a validated gang member, both while he was in prison and afterward. That one of the officers, the gang officers, who was actually involved in the validation, was an officer involved in this case. That was Detective Montgomery, Travis Montgomery. And that he had validated him as a UBN member, that the United Blood Nation is a gang involved in violence and known to carry firearms. That testimony was all adduced at the suppression hearing as well. Layered on that, of course, Your Honors, is the fact that there was this ongoing gang feud involving this defendant in the time frame leading up to the Dixie Classic Fair on October 3rd of 2018. And that in the weeks preceding this October 3rd incident, that Mr. Gibbs Davis' residence had been the subject of drive-by shootings. And that that same street that he lived on, Richard Allen, which is East Winston, that that street had also been involved in essentially an ongoing gang feud as well. And that the day before this incident, on October 2nd of 2018, that Mr. Gibbs Davis, because he was a member of a security risk group, that is, a validated gang member, they were monitoring his Facebook. It was a public-facing Facebook page. And that on that public-facing Facebook page, he had a picture of himself with a fanny pack. It's a champion fanny pack. We know, based on the evidence, that that was the same fanny pack he had the next day, October 3rd. So he has the fanny pack on October 2nd. He posts to his Facebook page. Then the next day is when he posts at 10.02 in the evening to ops, see me at the fair. I got it on me, little boy. Fanny pack gang. There's the red devil emoji at the end of that. And then after that post, shortly after that post, someone responds. Let him know, Chan. He's putting people on notice that he will be at the fair. He's been the victim of violence before. His house has been shot up. And that he's going to go to the fair. And as Judge Tilley pointed out, as the district court pointed out below, that I'm going to be at the fair. I'm going to be armed. And if you want some of me, I've got it in my fanny pack. I'll be armed and ready. You will not get the drop on me. That was the essence of that post. And so there's the post that he made. I don't want to criticize that, but why would that make any sense? That's the opposite of you won't get the drop on me, right? Seems like to me it's like setting yourself up. Typically speaking, if I was engaged in a feud or doing something like this, I don't announce it. If I go out hunting, I don't sit in the deer stand and announce that I've got a gun. I try to be quiet. Help me understand why. I'm trying to understand why he would announce it this way. What's the real point? It's not that I don't want somebody to get a drop on me, right? It's the opposite. Well, I would argue, Your Honor, that it's putting people on notice. It's a warning. It's a warning to those who would do him harm that he's going to be armed. And so. He's going to start a shootout or something? Well, again, I think. He wanted to start a war? I don't think it was that he wanted to start a war. I think it was essentially a prophylactic measure. It's I've got a firearm. And so understand that, you know, if you try to engage in violence at the fair against me, I'm prepared. I mean, that's the argument. And I understand the court's point as far as why would you announce it. But, again, understanding, unfortunately, that in this Facebook world of, I need to post and let people know what's going on, but especially I have to look, you know, like I'm really a big shot, essentially. The court observed that he kind of confessed or something spontaneously. That's absolutely true, Your Honor. Is that right? That's correct. During the. What was it he said? He said that. What the defendant said. The defendant said. The court observed what the defendant said. Correct. And the defendant said after they conducted the search, y'all be monitoring the social media, basically, that you all are really paying attention to this. And then he said, I told on myself. But all that's after. That's true. That's true. So it can't be taken into account for justifying the Terry stop. It cannot. We can't bootstrap. But I do think that it's important, and I would argue that it's important in the sense that it corroborates, as the district court said, when Judge Tilley made his findings, that was one of the things he pointed out afterwards. And he said it's gratuitous, but here's the thing. It goes to show the reasonableness of the interpretation of the officers. The interpretation of the officer about what? About the posts. About the meaning of the posts. Correct. Okay. But Mr. Gowan, it seems to me your argument is going on a parallel track to Mr. Trivett. Mr. Trivett's not really taking issue with these being the facts of the case. What he's saying is they had to get a warrant to search the bag, and then he raises Buster. So it seems to me in order to engage in this case, you're going to have to address Buster and Mr. Trivett's argument regarding probable cause and whether that was required. In other words, a warrant was required as opposed to a Terry stop. And in answering that and addressing that, I'd be really interested in you talking about whether the fanny pack was part of his body for the purpose of the frisk, or was it not? And give me the reasoning that you would go to get there. Sure. Certainly, Your Honor. First of all, as to the last part first, the fanny pack is part of his body. In the sense that a holster would be a part of someone's body if they had it on. He was handcuffed, so it still was part of his body? Yes. Absolutely. And here's the thing. This Court has talked about the fact that handcuffs are not a fail-safe. So the situation that the Court is aware of and the evidence at the suppression hearing is that they approach him from behind, that they get his hands and put him in handcuffs behind his back, that one of the other officers, Officer Montgomery, is there and has a hand on his arm, that the fanny pack is the actual pack part of it is in the front. The reality is that that's far from being subdued. Understandably, he can't use his hands to the extent that he wants to, but he's still upright. And that's a tremendous distinction from what happened in Buster, where the individual is on the ground, in handcuffs, face down. This whole idea of he's immobilized or he's disabled, that's not true. The fact that a person has handcuffs on is certainly some detention and some constriction, but it does not prevent the individual from running away. It doesn't prevent the individual from dropping to the ground and trying to get the handcuffs under their body. And so the other important distinction, too, is actually unlike a holster that would be between belt loops on a belt, that the fanny pack, of course, is separate in the sense that it is on a loop, on a strap, and can be turned around. So even while he has his hands behind his back, he could access it if he turned the fanny pack around. And so to say... We don't know. I mean, we don't know how tight the fanny pack was, do we? Well, we don't know how tight it was, but we do... You're just saying that it wasn't a fail-safe situation. Correct. Absolutely, it was not. The other part, Judge Keenan, is the fact that the Buster court specifically exempted  When they talked about that this opinion in Buster does not address situations where a firearm was found on a suspect's person. And if the court is going to draw a fine distinction between the fact that it's in a fanny pack on a person versus simply in their pocket, that, I would argue, is too fine a distinction to make. So... Well, let's just say we end up agreeing with you and we're writing the opinion. Tell me how you would write the opinion. Is there any other way to write this opinion other than to say the fanny pack was part of his body for purposes of the frisk? Is there any other way to approach it? Well... And to affirm the case with regard to... Can you say the fanny pack was not a part of his body and still affirm? I would argue that the court could. And how would you do that? There are additional ways in terms of what Buster does not reach. And that is, it doesn't reach a bag that was opened before a suspect was subdued. Here, this defendant was not, I would argue, subdued, nor was the bag opened before he was subdued. There was a frisk, and that's different. Because, as the court knows, the bag in Buster was actually cut off of the defendant in that case, and so it's away from him. And then the third part that would draw a distinction between this case and Buster is that Buster does not reach, as the court said, situations where the person is still within reach of the bag. And again, because the bag had been cut off and it was away from them here, the bag is still on him. It has not been taken off, cut away, whatever. Didn't the evidence here also show this sort of idea of the plain feel? And you sort of argued that when they went to pat him down, they've got some information on the front end, right? And they literally are patting the bag down. And upon patting the bag down, they then feel the gun. Yes. And at that point, don't they have probable cause to actually search him? I mean, part of the point in Buster that the court noted at footnote 2 is that that argument was not made in Buster and was not, therefore, passed upon. But it seems to me that's a distinction that in doing the pat down, once you feel what the officer indicated believed was a gun, particularly in light of the prior information, that at that point we have enough. I would agree, Your Honor. I would certainly agree that there's probable cause at that point that a crime is being committed because they knew he was a convicted felon. Why wouldn't the officers, and I'm just throwing this one out for your reaction, why weren't the officers required to remove the bag from his body? They had all this information that he was a convicted felon, he was coming to the fair with a gun in his fanny pack. Why, when they stopped him and detained him, why wouldn't we require them to simply remove the fanny pack from his person at that point? In the same way that when Officer McFadden and Terry conducted a pat down of the outer clothing of Terry, that he wasn't required to take his coat off in order to get the gun out of his leg. Right, but they already had him in handcuffs at this point. The suspect wasn't in handcuffs in Terry, I don't think. No, he was not. Right, and so here the defendant's already in handcuffs and the officer had all that information pointing to the gun being in the fanny pack. So, why shouldn't we be instructing that the proper conduct in this case is to remove the fanny pack? To remove it before the frisk is conducted? Because the officers had the man handcuffed, why not just unclip the fanny pack and remove it? And then there would be no issue of him getting to the fanny pack. That's true, that there would be no issue of his ability to get to the fanny pack at that point. But, again, the idea behind the investigation and the investigative search, the ability of officers to conduct a Terry frisk, it would certainly make sense that because it's actually on him that they would conduct the pat down as part of that frisk. Would they need, I mean, would they need, so you need reasonable suspicion to do a pat down. But to seize the item, you might argue, in order to remove it and take it somewhere, you need probable cause, right? I mean, because that's no longer a Terry frisk, which is reasonable suspicion. But if I take the bag off of you, and I haven't really seen this argument made, but if I take it off of you and move it to the car, I then seize that item, right? And we generally think that requires probable cause in order to do that. Yes. Right, where to pat him down, they only need reasonable suspicion. So an officer might well believe that in order to remove the bag and do something with it, I need probable cause to ensure that there's not a weapon, but nothing more, I get to do just a straight pat down, not a search of the bag, not a removal, not anything other than just the pat down. That's the sort of point of Terry, right? Correct. Has the government ever argued that this wasn't a Terry case, it was a probable, it turned into probable cause, and it was an unwarranted seizure? The government has not. But there was probable cause. They didn't, under the circumstances, need to go get a warrant. Have you ever, have you all argued that? We didn't argue that in this, the government did not argue that in this case. We argued related to the reasonable suspicion, consistent with what. So you're saying it's all a Terry deal, but Judge Richland makes a good point about, you found the gun, you seized it. That's correct. And the Terry pat down. That's correct. For safety. Yes. The rationale for Terry is the officer's safety, not for investigation. Isn't that correct? Well. Wasn't that the rationale in Terry? Because it's a two-part analysis, I mean, the fact that there has to be reasonable suspicion that a crime is being committed, and then that this person is armed and dangerous. And the interesting part about that is. But to answer the question, if you would, please. Is the rationale for Terry, the pat down for the officer's safety? The safety of the officer and others. Correct. But not for investigatory purposes. That's correct. That's correct. You said a minute ago, an investigative pat down, I think is what the point. And that's a misnomer, right? You don't mean that they're doing it for investigation. They're doing it for safety. Whoever's safety that might be. Correct. But investigation could be a word that goes with that. I don't know that the fact that you throw in investigative control. Right. They're entitled to do what they need to do to protect themselves and the public. That's correct. If they have reasonable suspicion. Yes. But if they find contraband, drugs, guns, whatever they find, they can go from there. Now, whether they need to go get a warrant or not, Mr. Trevitt took two positions on that. He said they didn't need to. Then he says he's taken a position they did need to go get a warrant. Was that litigated before Judge Tilley? No. The issue of whether or not he was arrested was not litigated before the district court. So that would essentially be plain error. There would be a plain error analysis. But the government's argument, of course, is. . . There was a pat-down and a seizure. Yes. There was a search and a seizure. Was that this pat-down never did turn into a search? Well, a pat-down. . . You seized the firearm. That's correct. I mean, as Terry points out, the pat-down does constitute a search. And so there was a search in the sense of a pat-down that was conducted and this defendant had a firearm and then the firearm was seized from the fanny pack. Again, that's because it's not just that they felt a hard object, that they felt a hard object consistent with a firearm. That was Detective Jamerson's testimony. And if they knew he was a felon and they knew he had a firearm or found out he had a firearm, they had probable cause right there. That's correct. They didn't need to go to any magistrate and get a warrant. No. No, Your Honor. That's correct. Your Honors, based on the fact that the testimony in the district court established that these experienced gang unit investigators believed that the defendant had a firearm on him at the Dixie Classic Fair back on October the 3rd of 2018, that the district court appropriately considered that information and based on the totality of the circumstances, the court determined there was in fact reasonable suspicion in the case and that their subsequent pat-down of the defendant's seizure of the firearm was appropriate. Based on all of that information, we would ask that you affirm the district court. I'll be happy to answer any other questions the court may have. Thank you, Your Honors. Thank you very much, sir. We appreciate it. Mr. Trevitt. Thank you, Your Honor. And I will take issue with one factual thing that Mr. Gallion said that I don't think the record supports that there was a gang feud going on. I'm pretty sure about that. As the court recognized, any statement… There have been multiple drive-by shootings at this guy's house, right? That was in the record. And his text message at least interpreted by people who read these or the Facebook messages interpreted by people that read this referred to the opposition. That's how the officers interpreted it, Your Honor. We don't concede that that was reasonable. But that's the government's position. That's what the officers think. Turns out like that's what your client said after the fact, right? I hate it when that happens, Your Honor. And as the court points out, things that happened after the search, statements made can't be considered in regard to whether… They can be considered, but they can be considered to determine whether what the officers believed was reasonable, right? It'd be hard for us to say this was so unreasonable, no officer could believe it. And it turns out that it was exactly what your client said he meant by those words. That's a good point, Your Honor. You understand I don't concede it. I understand. It is really like Buster. I understand that there is this sentence. Buster, your best case, I guess, you probably did after the fact. Yes, sir. It was not argued. What we're talking about mostly today was not argued in the district court. The district court treated it strictly as a Terry stop, and he said there was reasonable suspicion. He didn't really address. So when you reserved, you pled, your client pled guilty and reserved the right to appeal. Yes. In agreement with the government. At that time, you weren't coming up here on a Buster issue. No. No. Buster decided about five weeks ago. Well, you were going to come up here and argue that that statement on the Facebook page wasn't enough to give them reasonable suspicion. That was what was argued in the district court, and we certainly take that position today. But Buster does apply to this case because we're now on appeal. Plain error, I suppose that's correct. But it really, on the facts and the one distinction that was the firearm on him, we take the position that's more a statement of, like in Officer McFadden, he feels the gun on Terry and he pulls it out. You don't contest the seizure, do you? It was a proper seizure, wasn't it? I am contesting the seizure, Your Honor. Well, they knew he was a felon. Once they pat him down and found the gun, they had to seize it. I have to take the position that Buster applies and that at that point they have to get a warrant. I understand that's… Well, they should have stopped at what point? When she felt the gun or immediately since they had evidence that Judge Keenan brought up that there would be a gun in there, it should have been removed from him and put aside and a warrant should have been obtained. That's really what I have to argue on these facts, Your Honor, that Buster still applies and the fact that it was in the fanny pack. Well, a reasonable suspicion gives them a right to a pat down. Yes, Your Honor. If reasonable suspicion… Pat down and there's a gun. Is the fanny pack part of his body for purposes of the frisk? I mean, isn't that really kind of the nub of this? I don't think I have a good argument to say that once they had disabled him and put handcuffs on him that they couldn't do a frisk. It certainly, the fanny pack, it appears from… I don't think the record's clear on that. That's the problem. Well, when you look at the video, though. The video, very briefly, shows it's in front, which makes sense. If you're going to grab a gun, it's going to be in front. I've asked your opposing counsel, and this is something that seems to me to be a very serious issue we have to confront that might have a lot of application in future cases on whether a fanny pack with information that ties the fanny pack to evidence of a crime, that the fanny pack is part of the body, is no different than in a chest pocket of a shirt. That a fanny pack was part of his body for purposes of the Terry's stop. In other words, you could frisk the fanny pack just as much as you could frisk his chest, his legs, everything else. I mean, that's really what we've got to face here, it seems to me, and I'd like your take on that. I think that when Officer Jamerson did her pat down... Excuse me? When Officer Jamerson did the pat down, and she felt it, if the court is to find that they had reasonable suspicion to stop him, at which point we're not conceding, but if they had the ability to stop him and seize him and put handcuffs on him and they're still within a Terry's stop, a pat down is appropriate. It's on his body. I think you understand the point that I've been making. I mean, it's an issue of law, so it's not something you can concede. I'm not trying to get you into any trouble. We've got to come up with the answer, and I'm just interested in your perspective on it. I think the court really understands these issues very well, and maybe I... Yes, thank you. Thank you, Your Honor. It's been an honor to be here. We thank you. We know you're court-appointed. We appreciate your work and your assistance. It's a privilege to be here, Your Honor. In handling this case.
judges: Robert B. King, Julius N. Richardson, Barbara Milano Keenan